UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


ROBERT L. WELCH,                    )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )        No.  2:10CV021 JCH
                                    )                    (TIA)
MICHAEL ASTRUE, Commissioner        )
of Social Security,                 )
                                    )
                    Defendant.      )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).

## I.      Procedural History

Claimant is proceeding in this cause without the assistance of retained counsel.  Claimant's

Complaint was filed on March 16, 2010.  On March 19, 2010, the Court entered a Case

Management Order setting out the briefing schedule to be followed in this cause in accordance

with Rule 9.02 of the Local Rules of this Court.  Defendant Commissioner of Social Security

timely filed his Answer to Claimant's Complaint on May 27, 2010.  On October 21, 2010, the

undersigned ordered Claimant inform the Court whether he intended to pursue his claims based

solely on the allegations made in his Complaint, or whether he wished to submit to the Court a

Brief in Support of his Complaint.  Claimant filed a letter indicating that he intended "to pursue

[his] claim based solely on the allegations made in [his] complaint."  (Docket No. 16). Claimant

contends that the final decision of the Commissioner was not based on substantial evidence because:

> My injury wasn't presented as a spinal cord injury. I've multiple sidefex & disabilitys from the injury. My attorney did not present a letter I received from Dr. Acuff's office stating that I could not work.... I was also intimidated and feel I was manipulated into answering questions that was uncertain to me by the Administrative Law Judge.

Plaintiff's Complaint for Judicial Review of Decision of the Commissioner of Social Security (Docket No. 1/filed March 16, 2010).

On February 22, 2005, Claimant filed Applications for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 63-68)[1] and Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 19), alleging disability since January 6, 2005 due to broken back, L4, ruptured intestines, plates in back from L4 to T121. (Tr. 46-50, 87). The applications were denied (Tr. 48-52), and Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on May 9, 2007. (Tr. 45, 463-90). Vocational Expert Darrell W. Taylor, Ph.D.,CRC, CVE, a qualified vocational expert, also testified at the hearing. (Tr. 38, 483-89). In a decision dated August 22, 2007, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act, from January 6, 2005 through the date of the decision. (Tr. 16-28). After considering the records from Howard A. Rusk Rehabilitation Center dated 2005-2008 and a letter from Dr. Acuff, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on January 28, 2010. (Tr. 5-8, 439-62).

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer. (Docket No. 14/filed March 27, 2010).

Thus, the ALJ's decision is the final decision of the Commissioner.

## II.  Evidence Before the ALJ

### A.  Hearing on May 9, 2007

#### 1.  Claimant's Testimony

At the hearing on May 9, 2007, Claimant testified in response to questions posed
by the ALJ and counsel.  (Tr. 465-83).  At the time of the hearing, Claimant was forty years of
age.  (Tr. 466).  Claimant's date of birth is February 19,1967, and he is right-handed.  (Tr. 466).
Claimant lives with his wife and his two children ages fifteen and seventeen.  (Tr. 467). Claimant
completed high school and over one year of Linn Tech, a technical school where he trained as a
heavy equipment operator.  His mother drove him to the hearing, because he lost his license after
his motor vehicle accident.  (Tr. 467).  Claimant has had Medicaid since the accident.  (Tr. 478).

Claimant last worked in December 2004 at Cardinal Health as a machine operator.  (Tr.
468).  Claimant worked for five years operating horizontal packaging machines, and he lifted
stock weighing from twenty-five to one hundred pounds. (Tr. 468).  Claimant testified that he
worked a lot of short jobs including working as a driver of a flatbed delivery truck and a laborer
for Jones Lumber.  (Tr. 468-69).  Claimant also worked at Discount Glass as an installer of
windshields on cars.  (Tr. 469).  Claimant worked at Custom Composites Company as a finisher,
and his job duties included sanding and painting fiberglass molding.  (Tr. 469). Claimant worked
for David Edgerton as a dozer operator and at Suhor Industries as a laborer building vaults for
caskets and delivering the vaults to the sites.  (Tr. 469-70).  Claimant then worked for
Professional Services Transportation as a semi-diesel mechanic and changed tires on large trucks.
(Tr. 470).  Claimant testified that he did not work a lot in 1995-96.  From 1991-94 Claimant

worked at Alkin Company running a six-spindle screw machine that produced small metal components used in brake levers in cars. (Tr. 470-71). His job required him to lift pieces to the machine and the pieces weighed from fifty to one hundred pounds. (Tr. 471). Claimant worked for Metro East Industries as a lathe operator. (Tr. 470).

After Claimant's automobile accident on January 7, 2005, he never returned to work. (Tr. 471). Claimant testified that he was treated by several different doctors, and he had back and intestinal surgeries. (Tr. 472). As treatment for his spinal cord injury, Dr. Acuff admitted him to Rusk Rehabilitation until the end of February. At Rusk Rehabilitation, Claimant learned how to walk again. Dr. Yarlagadda, a neurologist, continued to treat Claimant for his restless leg syndrome and his foot pain and prescribed Cymbalta. Claimant received medical treatment for pain management and injections in his back as treatment of the ruptured disc. (Tr. 472). Claimant last received an injection a couple months before the hearing. (Tr. 473). Claimant testified that the injection helped. Dr. Zsolt Ori is his primary care physician, and he prescribes Claimant pain medication including Percocet. Claimant also takes Requip for his restless leg syndrome. (Tr. 473). Claimant also takes a lot of Ibuprofen and Tylenol. (Tr. 474). Claimant testified that he recently had cataract surgery on his right eye, and he has implants in both of his eyes. (Tr. 482). Claimant has problems focusing on reading, and he can read ten to fifteen minutes. (Tr. 482).

As to his daily activities, Claimant testified that he wakes up around 6:30 a.m. but goes back to sleep until 9:30 a.m. (Tr. 475). Claimant testified that he cannot fall asleep until midnight. (Tr. 481). Claimant watches television and scans pictures from his mother's digital camera so that his family members can have copies. (Tr. 475-76). Some days Claimant has

difficulty taking care of his personal needs.  Claimant testified that he no longer uses any kind of assistive devices.  Claimant used a wheelchair and then a walker for six months after leaving Rusk Rehabilitation.  Claimant shops with his mother, goes to the farm with his father, and attends his children's school events including baseball games.  (Tr. 476).  Claimant helps his father at the farm by checking the oil and the air in the tires and feeding the catfish in the pond.  (Tr. 477).  Occasionally Claimant will go out to eat.  (Tr. 477).

Claimant testified that he could comfortably lift ten to fifteen pounds and, on a good day, twenty-five pounds.  (Tr. 478).  Claimant can walk/stand for no more than two hours.  Claimant can sit for no more than two hours.  (Tr. 478).  Claimant testified that his left arm is weaker than his right arm, and if he rests his hand on anything, his hands fall asleep.  (Tr. 479).  Claimant testified that he can no longer play the guitar and hunt with a bow.  (Tr. 479).  Claimant experiences pain in his lower back and numbness in his feet.  (Tr. 480).  His coordination is not good, and Claimant drags his feet.  (Tr. 480).  His pain medications cause him to be drowsy, and sometimes Claimant takes a nap for about three hours.  (Tr. 480-81).  Claimant testified that when he plants flowers he has aches and pains the next day because of the bending and the using of the shovel.  (Tr. 481).  Claimant testified that sometimes the pain causes him to be laid up all day.  Claimant testified that he has good days and bad days.  A good day is when Claimant can play with his children or the dog or go to the farm.  (Tr. 481).  A bad day is when the depression kicks in, and he has problems controlling his bowels.  (Tr. 482).  Claimant testified that he has bad days two to three times a week.  Claimant has bowel accidents every day.  (Tr. 482).

## 2.  Testimony of Vocational Expert

Vocational Expert Dr. Darrell Taylor, Ph.D.,CRC, CVE, a qualified vocational expert,

testified in response to the ALJ's questions. (Tr. 483-89). The ALJ asked the vocational expert based on the exhibit file with regard to vocational matters to determine what, if any, past work Claimant has performed in the last fifteen years. (Tr. 483). Dr. Taylor testified that Claimant worked as a heavy equipment operator, a medium, semi-skilled position and as a diesel mechanic, a heavy and semi-skilled position. (Tr. 438-84). Dr. Taylor explained that Claimant's machine operator job was a medium, semi-skilled position; his driver in the lumberyard job was a heavy, semi-skilled; his cemetery worker position was heavy and skilled with an SVP of 5; his screw machine operator and lather operator positions were heavy and semi-skilled; and his finisher for auto parts was medium and unskilled. (Tr.484-85). Dr. Taylor opined that from any of the skilled or semi-skilled jobs Claimant worked there were no transferable skills to lighter than medium. (Tr. 485).

The ALJ then asked Dr. Taylor to assume a hypothetical individual of Claimant's age, education, and work experience with the ability to lift twenty pounds on occasion, ten pounds frequently, to stand and/or walk about six hours in an eight-hour workday, to sit at least six hours in an eight-hour workday, limited to simple and/or repetitive work that does not require close interaction with the public or coworkers, to decide on goals and procedures for every day, and to avoid work with concentrated exposure to whole body vibration. (Tr. 485-86). Further, the ALJ asked Dr. Taylor to assume that the hypothetical individual should avoid climbing ladders, ropes or scaffolds and not work at protected heights or around unprotected machinery. (Tr. 486). The ALJ asked Dr. Taylor whether the outlined restrictions would preclude the hypothetical individual from performing all past work. Dr. Taylor opined that the restrictions would preclude any of Claimant's past work. The ALJ asked Dr. Taylor whether there would be other jobs that could be

performed within those restrictions.  Dr. Taylor indicated that there would be light, unskilled positions within the state of Missouri including approximately 4,000 hand packer positions and 4,000 janitorial cleaning positions.  (Tr. 486).

Next, the ALJ asked Dr. Taylor to further assume that the hypothetical individual had ulnar nerve in both eyes causing him to have some difficulty with discriminating size, shape, and texture of objects and the person could not work assembling or working with very small parts would that preclude or reduce the number of jobs available to the individual .  (Tr. 486-87).  Dr. Taylor opined that the restrictions would affect the hand packer position, not the janitorial position,  inasmuch as there are smaller parts.  (Tr. 487).  Dr. Taylor indicated that he would reduce the number of hand packer positions by fifty percent noting that the individual would have the ability to perform dexterity and hand fingers, both gross and fine manipulation, at the frequent level.  (Tr. 487).

Next, the ALJ asked Dr. Taylor to reduce the hypothetical individual's exertional level to the sedentary level with the maximum ability to lift ten pounds and to stand and/or walk about two hours in an eight-hour workday and leave all the other restrictions in place.  (Tr. 488).  Dr. Taylor opined that there would be assembler positions at the sedentary level, but he would reduce the number by fifty percent.  Dr. Taylor noted that there would be approximately 2,000 positions, but the individual would have to still retain a frequent use of fingers and hands in both gross and fine motor coordination.  (Tr. 488).

The ALJ asked Dr. Taylor whether adding that the individual could sit and not have to take a break for two hours at a time would enable the individual to work a regular eight-hour workday.  Dr. Taylor responded yes and noted that the exertional level would have to be

sedentary.  (Tr. 488).

The ALJ asked Dr. Taylor to assume that the individual had a medical condition that would cause the person to miss more than two days a month on a regular basis, would the individual be able to perform competitive employment in jobs he described.  (Tr. 488).  Dr. Taylor opined that such medical condition would preclude the individual from competitive employment for all the jobs he described including the assembler, the hand packer, and the janitor.  (Tr. 488).  Further Dr. Taylor opined that if the individual had to show up late or leave early or be away from the work setting for medical reasons at least once a week the equivalent in duration of an additional break time, this restriction would preclude the positions described.  (Tr. 488-89).

### 3.  Open Record

At the conclusion of the hearing, the ALJ noted that he did not have recent medical evidence and decided to schedule a consultative examination of Claimant.  (Tr. 489).

In a letter dated May 25, 2007, the ALJ apprised Claimant's counsel of the request he made to Disability Determination Services to schedule a consultative examination of Claimant.  (Tr. 114-17).

In a letter dated June 25, 2007, the ALJ apprised Claimant's counsel that he had secured additional evidence, the consultative report of Dr. Craig Heligman, and that he proposed to enter the evaluation completed by Dr. Heligman in the record after counsel's review.  (Tr. 119).  A review of the record shows that the ALJ timely submitted the evaluation.  (Tr. 424-38).

### 4.  Explanation of Determination

In the Explanation of Determination, the disability examiner explained the denial of benefits as follows:

This is a 38-year old claimant with 13 years education and a work history that includes several jobs. He alleges disability due to injuries he sustained in an MVA. This is confirmed by medical in the file. He quit work prior to that because he was terminated. The claimant has failed to submit ADL and 3369 forms. Medical evidence shows the claimant has experienced improvement in his condition since the accident. Without the necessary information from the claimant, we are unable to complete the RFC. Attempts were made to contact the claimant regarding the forms, but these were not successful. Therefore, benefits are denied.

(Tr. 36).

### 5. Forms Completed by Claimant

In the Disability Report - Appeal, Claimant reported having "trouble standing or walking I can't carry or lift anything. I can't do steps, only straight level." (Tr. 82).

In the Disability Report - Adult, Claimant reported that he stopped working on December 29, 2004, because he was terminated. (Tr. 88).

## III. Medical Records

On September 2, 2003, Claimant received treatment at Dr. Lyndell Scoles' office for low back pain. (Tr. 126). Claimant reported seeing a chiropractor who adjusted his back multiple times without improvement. Claimant reported having pain in his shoulders and lower back since his accident in 1996. (Tr. 126). Dr. Scoles prescribed Ultracet and Flexeril as treatment. (Tr. 128).

The MRI of April 8, 2004, showed a disc herniation at L5-S1. (Tr. 288, 290). On May 10, 2004, Dr. Jeffrey Parker administered an epidural steroid injection, and Claimant later reported improvement with his pain. (Tr. 290-91).

On December 10, 2004, Claimant reported right low back pain over the lower sacral region. (Tr. 293, 418). As treatment, Dr. Donald Meyer administered a lumbar epidural steroid

injection. (Tr. 294, 420). Claimant reported that the physical therapy treatment provided in the last year had been helpful. (Tr. 296, 417).

On January 7, 2005, Claimant was admitted to University Hospital's emergency room after a rollover motor vehicle accident in which he was ejected from and pinned beneath his truck. (Tr. 158-256). Claimant arrived paralyzed and sedated. (Tr. 161). Dr. James Kessel determined Claimant's preoperative diagnosis to be multi trauma with an acute abdomen. (Tr. 170). Dr. Kessel performed the following surgical procedures on Claimant: exploratory laparotomy, abdominal washout, small bowel resection, closure of transverse colon serosal tear, and placement of abdominal wound VAC closure device. (Tr. 170). Dr. Marc Miller ordered a MRI spine thoracic examination. (Tr. 174). Dr. Miller noted "that on multiple images is a linear zone of increased signal within the epidural space anterior to the cord extending from the level of the C5-6 disc space superiorly to the T1-T2 level inferiorly. I do not visualize injury to the adjacent vertebral bodies. I do not identify cord abnormality. The possibility of epidural hemorrhage cannot be excluded in that area." (Tr. 174). The MRI of Claimant's lumbar spine showed a fracture involving the L1 vertebral body with anterolisthesis at T12 in relationship to L1. (Tr. 176). The MRI further showed abnormal signal within the adjacent cord consistent with cord injury; compression of the thecal sac from the posterosuperior margin of the L1 vertebral body; and disc herniation at L5-S1 level. (Tr. 176-77). The CT of Claimant's lumbar spine showed L1 burst fracture with spinal canal compromise. (Tr. 178). The CT of Claimant's thoracic spine showed L2 spinous process and right transvers process fracture and burst fracture L1 with spinal canal stenosis and posterior retropulsion. (Tr. 179). The CT of Claimant's cervical spine revealed no fracture or subluxation . (Tr. 184).

On January 10, 2005, Dr. Kessel performed an exploratory laparotomy, small bowel anastomosis, and closure of abdomen with placement of retention sutures. (Tr. 196).

In the rehabilitation consultation note of January 11, 2005, Claimant reported drinking approximately one pint of whiskey a day and smoking one to two packages of cigarettes each day. (Tr. 199-200). Claimant reported currently being unemployed since mid-December when his position was terminated at the factory where he worked. (Tr. 200). In the impression section, Dr. Scott Swasey noted Claimant to have multiple trauma including injury to small and large bowel and a spinal cord injury. (Tr. 201). As treatment, Dr. Swasey recommended physical therapy and occupational therapy, gastrointestinal treatment, and monitoring for depression. (Tr. 202). Dr. Swasey noted that Claimant would be discharged to acute rehabilitation center for work with spinal cord injury problems involving bowel and bladder and most likely impaired motor function. (Tr. 202).

On January 14, 2005, Dr. Robert Gaines performed posterior spinal fusion T11 to L2 with posterolateral local bone graft and a VSP plate placement and decompressive laminectomy at T11. (Tr. 210). The orthopedic procedure was performed to stabilize his lumbar and lower thoracic spine. (Tr. 226). L1 compression fracture along with T12 through L1 fracture dislocation with preoperative neurological defects is listed as Claimant's postoperative diagnosis. (Tr. 210). The ultrasound of Claimant's abdomen showed incidental small bilateral pleural effusions. (Tr. 214). On January 17, 2005, Claimant was fitted with a Jewett brace. (Tr. 226). On January 24, 2005, Claimant was discharged to an inpatient rehabilitation facility. (Tr. 226).

Claimant requested and received a psychiatry consultation at the University Hospital on January 21, 2005. (Tr. 163-66). Claimant reported mood swings but no depression before being

admitted to the hospital after the car accident on January 5, 2005.  (Tr. 163).  Dr. Kristin

Parkinson diagnosed Claimant with depression noting that Claimant has several medical and social

stressors and prescribed medication to assist with sleep and depressive and anxious symptoms.

(Tr. 166).  Dr. Parkinson found Claimant exhibited normal thought process, cognition, and

memory.  (Tr. 165).

Claimant received treatment at the Howard A. Rusk Rehabilitation Center from January

26, 2005, through February 28, 2005.  (Tr. 258-75).  Claimant's admission diagnosis included

paraplegia, paralytic bladder, and neurogenic bowel secondary to a motor vehicle accident, a

spinal cord injury, ruptured disc, and T12-L1 burst fracture.  (Tr. 258).  His discharge diagnosis

included incomplete paraplegia, paralytic bladder, neurogenic bowel, spinal cord injury, and T12-

L1 burst fracture.  As treatment, Claimant received physical therapy, occupational therapy,

psychology, speech therapy, and respiratory therapy.  (Tr. 258).  Claimant reported living with his

wife and five children and had been working in a factory when his job was eliminated in December

2004.  (Tr. 259-60).  Dr. Acuff served as his treating doctor during his treatment at Rusk

Rehabilitation.  (Tr. 258-63).  As treatment for his pain in the thoracolumbar region, Dr. Acuff

prescribed Percocet and increased his Neurontin prescription and decreased his oxycodone in

frequency due to the potential of addiction.  (Tr. 262).  Dr. Acuff noted that Claimant seemed to

tolerate his pain well and he had been weaned off most of his narcotics at the time of discharge.

After being prescribed Zanaflex, Claimant reported having good sleep and feeling better.

Claimant received aggressive nursing rehabilitation program for bowel and bladder function.  (Tr.

262).  In the discharge summary, Dr. Acuff noted Claimant to be medically stable with a traumatic

injury, and he participated in rehabilitation program well.  (Tr. 263).  Dr. Acuff noted that

Claimant required minimal assistance with stairs, and he exhibited much improvement in overall function. (Tr. 263). Dr. Acuff advised Claimant to establish a relationship with psychiatry for evaluation and treatment of his depression and anxiety. (Tr. 264). Dr. Kouba discussed with Claimant the cessation of a smoking. (Tr. 274).

Claimant started physical therapy treatment at HealthSouth on January 7, 2005 to reduce his low back pain and finished the treatment on March 7, 2005. (Tr. 132-57, 298, 305-08). In the summary of progress, the physical therapist noted Claimant's pain to be consistently around a four out of ten but sometimes at the level of seven/eight of ten. (Tr. 132). In the February 22, 2005 treatment note, the therapist noted Claimant to be making good progress toward functional goals. (Tr. 147).

In the February 3, 2005 orthopaedic clinic note, Claimant returned for follow-up treatment after a posterior spinal fusion of T11 to L2 with posterior lateral local bone graft and VSP plate instrumentation completed on January 14, 2005. (Tr. 229). Since being discharged from the hospital, Claimant has been undergoing spine rehabilitation at Rusk Rehabilitation. (Tr. 229). Dr. Jason Leaseburg found that Claimant should discontinue the use of the brace whenever he is lying supine or sitting, but Claimant should continue to wear the brace any time he is out of bed and ambulating for two to three months. (Tr. 230). Dr. Leaseburg ordered Claimant to continue with physical therapy and activity as tolerated. (Tr. 230).

The EMG report findings of February 10, 2005, showed markedly decreased amplitude of the left ulnar CMAP with slowing of the nerve conduction velocity noted across the ulnar groove but no conduction block noted. (Tr. 232-37). Dr. Robert Conway concluded incomplete left ulnar neuropathy with severe axonal loss and incomplete right ulnar neuropathy with minimal

axonal loss.  (Tr. 233).

On March 1, 2005 on referral by Dr. Acuff, Claimant sought treatment for abdominal swelling at General Surgery Clinic.  (Tr. 241).  Dr. Thomas Watson found Claimant to have abdominal parasthesia and advised Claimant to monitor his bowel program over the next several days and to monitor his fullness in his stomach.  (Tr. 242).  At the time of treatment, Claimant presented himself in a wheelchair.  (Tr. 242).

Claimant started another round of outpatient physical therapy treatment at HealthSouth on March 7, 2005, and finished the treatment on May 20, 2005.  (Tr. 309-36).

On March 8, 2005, Dr. Durwood Neal evaluated Claimant for incontinence.  (Tr. 243-47).  After the motor vehicle accident, Claimant had some testicular and scrotal trauma.  (Tr. 246).  Claimant reported using a Depends and has a condom catheter and a Foley catheter in place.  Dr. Neal noted that Claimant's bowel and bladder issues are heavily linked.  Claimant reported voiding five to six times a day with urine leaking in between and always being wet.  (Tr. 246).  Claimant reported smoking for twenty-five years but no alcohol consumption.  (Tr. 247).  Dr. Neal noted that Claimant's urodynamics showed he probably voids pretty well but have a very large capacity.  Dr. Neal started Claimant on bethanechol and left him on Hytrin.  Dr. Neal directed Claimant to maintain voiding diaries.  (Tr. 247).

On March 18, 2005, Claimant returned to Dr. Acuff for a follow-up visit for his thoracic spine fracture.  (Tr. 249).  Claimant reported pain at the five level in severity, and he reported pain is fairly well controlled.  (Tr. 249).  Claimant reported being able to carry a small duffle bag weighing five to ten pounds and to ambulate independently with his Jewett brace in place.  (Tr. 250).  Dr. Acuff found Claimant to be medically stable with his spine fracture, debilitation,

impairment, and pain. Dr. Acuff determined no need for Claimant to continue follow-up treatment with him, but Claimant should continue treatment with Dr. Scoles, pain referral, and urology. (Tr. 250).

Claimant returned to Dr. Scoles office on March 18, 2005, reporting bladder and bowel dysfunction after the accident on January 7, 2005. (Tr. 129). Claimant reported that a neurologist has prescribed medication for treatment of his bladder, and he has been seeing a neurologist. Claimant reported having chronic back pain and not being given "enough percocet to last for 2 weeks." (Tr. 129). Dr. Scoles noted discussing with Claimant the possibility of weaning him off the medication over time. (Tr. 129). Examination of Claimant's back showed normal range of motion and strength with no joint enlargement or tenderness. (Tr. 130). Dr. Scoles prescribed Capsaicin and Ultracet. (Tr. 131).

On April 19, 2005, Claimant returned to the urology clinic. (Tr. 252-53). Claimant reported being constantly incontinent, and his post void residuals have been elevated in the past by urodynamics. (Tr. 253). Claimant reported using Depends. Dr. Neal increased his bethanechol dosage as treatment. (Tr. 253).

On referral by Dr. Scoles, Dr. Richard Wolkowitz evaluated Claimant on April 8, 2005. (Tr. 410). Claimant rated his pain at level two on a good day and level seven to eight on a bad day. Claimant reported recurrent right-sided low back pain. Claimant reported improvement with his right-sided low back pain after receiving facet injection and epidural steroid injection. Claimant reported that the physical and massage therapy in the past year have helped alleviate his pain. (Tr. 410). Dr. Wolkowitz listed lumbrosacral low back pain with spondylosis, history of L5-S1 disc herniation, and right sacroiliitis. (Tr. 412). Dr. Wolkowitz opined that he would

consider treating Claimant for lumbar epidural steroid injection with a right sacroiliac joint block in the near future. (Tr. 412). On April 22, 2005, Claimant returned to Dr. Wolkowitz for treatment, and Dr. Wolkowitz administered a lumbar epidural steroid injection and a right sacroiliac joint steroid injection as treatment for his sacroiliac joint anthropathy. (Tr. 406-09).

On February 6, 2006, Dr. Zsolt Ori evaluated Claimant for his back pain and spasms in his lower extremity. (Tr. 370). Claimant reported being depressed and not being able to use his hands because of ulnar neuropathy. (Tr. 370). Claimant reported his occupation as a musician. (Tr. 371). Dr. Ori diagnosed Claimant with unspecified inflammatory and toxic neuropathies and referred Claimant to a neurologist for the ulnar neuropathy and the lumbago and chronic urinary incontinancies. (Tr. 372). Dr. Ori prescribed Soma. (Tr. 372). The x-ray of Claimant's spine showed on overall relative stable appearance of the lumbar spine. (Tr. 384).

In the follow-up visit on February 27, 2006, Dr. Ori noted that a review of the x-ray of Claimant's lower back showed overall a relatively stable appearance of the lumbar spine. (Tr. 367). Claimant reported pain control better than last time and soma helping and indicated pain at level two. (Tr. 367). Claimant reported receiving counseling at the Behavior Health and Science Center for his moodiness. (Tr. 368). Dr. Ori refilled Claimant's Ativan prescription as treatment for his lower back pain and continued his pain medication including Ultram. (Tr. 368).

On March 2, 2006, Claimant returned to Dr. Wolkowitz for follow-up treatment after last being treated in April, 2005. (Tr. 402). Claimant reported the April injection helped for quite some time and more than the previous injections. His pain has started to return with his level at a two at the time of the appointment but as high as a seven on other days. (Tr. 402). Examination showed no evidence of pain or tenderness over the facet joints, and no evidence of dermatomal

weakness or numbness in the lower extremities. (Tr. 403). Dr. Wolkowitz administered a right

lumbar epidural steroid injection and right sacroiliac joint steroid injection as treatment. (Tr. 393,

403). Dr. Wolkowitz included in his assessment sacroiliac joint anthropathy and right lumbosacral

sciatica radicular pain and right sacroiliac joint anthropathy. (Tr. 404).

On March 3, 2006 on referral by Dr. Ori, Dr. Ravi Yarlagadda, a neurologist, evaluated

Claimant for his low back pain. (Tr. 352). Claimant reported not being able to sustain any

activity since January 2005 after the motor vehicle accident. After the accident, Claimant

experienced ambulation problems, but he eventually regained almost complete ambulation.

Claimant experiences residual deficits such as his feet not having full feeling and sometimes

hurting. (Tr. 352). Claimant reported stopping alcohol consumption on February 19, 2006, and

prior to that date, consuming two to three glasses of whiskey each day. (Tr. 353). Claimant

reported applying for disability. (Tr. 353). Examination showed Claimant to be alert, oriented to

time and place, with attention and concentration intact. (Tr. 354). Dr. Yarlagadda determined

Claimant to have predominantly small fibre polyneuropathy with a component of large fibre likely

due to alcoholism. As treatment, Dr. Yarlagadda prescribed cymbalta. (Tr. 354).

In a follow-up visit on March 29, 2006, Dr. Ori noted that Claimant received a shot of

steroid into the lower back at a pain clinic, and the treatment was very successful in terms of pain

management. (Tr. 364). Claimant reported continued lower back pains. (Tr. 364). Dr. Ori

refilled his Soma prescription and ordered daily walking and stretching, (Tr. 365).

On April 10, 2006, Dr. Wolkowitz administered a lumbar steroid injection. (Tr. 392).

On June 28, 2006, Claimant returned for follow-up treatment with Dr. Ori. (Tr. 361).

Claimant reported significant pain in his lower back at level eight. Claimant reported recently

seeing a specialist who diagnosed Claimant with a slipped disc and recommended an epidural pain injection as treatment. (Tr. 361). Neurologic examination showed Claimant able to walk without any difficulties. (Tr. 362). Dr. Ori increased his Soma and Ultram prescriptions and ordered daily walking exercises and recommended keeping the appointment with the pain specialist. (Tr. 362).

In a follow-up visit on July 14, 2006 at the pain clinic, Claimant reported near-complete relief for three months after receiving the paracentral epidural steroid injection and right sacroiliac joint block in March, 2006. (Tr. 398). Claimant's pain started in June. Examination showed no motor or sensory deficits, and no evidence of pain or tenderness over his facet joints or weakness or numbness in his legs. (Tr. 398-99). Dr. Wolkowitz administered a right lumbar epidural steroid injection and right sacroiliac joint steroid injection as treatment. (Tr. 399). In his assessment, Dr. Wolkowitz listed lumbar intervertebral disc disorder, lumbar stenosis, and lumbar spondylosis/facet anthropathy. (Tr. 400).

In a follow-up visit to Dr. Yarlagadda on September 15, 2006, Claimant reported his symptoms being better though persistent. (Tr. 350). Examination showed Claimant to be alert and oriented with intact attention and concentration, and good comprehension. (Tr. 350). As treatment, Dr. Yarlagadda increased Claimant's cymbalta prescription. (Tr. 351).

The Missouri Department of Elementary and Secondary Education, Section of Disability Determinations, referred Claimant to Dr. Deborah Wright, Ph.D., for an evaluation on November 3, 2006. (Tr. 279). Claimant reported being terminated in December, 2004 due to tardiness and absences and having been terminated from many of his former positions due to unexcused absences. (Tr. 280). Dr. Wright noted that his cognitive assessment identified him as having adequate memory, problem solving, orientation, comprehension, and expression. (Tr. 281). Dr.

Wright noted that Claimant has an extensive drug and alcohol history. His automobile accident in January, 2005 was alcohol related. (Tr. 281). Claimant reported that he smokes marijuana two to three times a day. (Tr. 282). Claimant smokes a package of cigarettes each day. (Tr. 282). Claimant reported that his symptoms of anxiety and depression have been a lot better since seeing a counselor five months earlier. (Tr. 284). In the Medical Source Statement for Ability to Do Work-Related Activities (Mental) date November 3, 2006, Dr. Wright determined that Claimant has marked ability to make judgments on simple work-related decisions and moderate ability to carry out detailed instructions and understand and remember detailed instructions. (Tr.276).

On November 29, 2006, Claimant returned for a follow-up visit with Dr. Yarlagadda. (Tr. 348). Dr. Yarlagadda found Claimant to have predominantly small fibre polyneuropathy with a component of large fibre, etiology includes alcoholism and continued Claimant's cymbalta prescription. (Tr. 349).

In a follow-up visit on January 31, 2007, Dr. Yarlagadda found Claimant to have predominantly small fibre polyneuropathy with a component of large fibre, etiology includes alcoholism and continued Claimant's cymbalta prescription. (Tr. 346-47).

On March 13, 2007, Claimant returned for treatment of L5-S1 spinal stenosis with disc bulge. (Tr. 395). Claimant reported that massage therapy helps alleviate the pain and physical therapy has helped. (Tr. 395). Dr. Richard Wolkowitz administered a left L5-S1 lumbar steroid injection as treatment. (Tr. 396). Dr. Wolkowitz prescribed Cymbalta and stopped the Oxycodone prescription. (Tr. 396). Dr. Wolkowitz included in Claimant's assessment right lumbosacral sciatica radicular pain and right sacroiliac joint anthropathy. (Tr. 397).

On March 23, 2007, Claimant returned to Dr. Ori's office reporting back pain. (Tr. 358).

A pain specialist treated Claimant two weeks earlier by administering a steroid injection in his lower back. (Tr. 358-59). Claimant reported the injection helping somewhat, but he reported significant pain at the level of a seven and requested pain medications. (Tr. 359). The neurologic examination showed Claimant able to walk on his toes and heels, and walks without limping, and his straight leg raising to be ninety degrees on both sides with some pain in the lower back. (Tr. 359). Dr. Ori referred Claimant for treatment to Dr. Jeffries, an orthopedic surgeon, for evaluation of the presumed ruptured disc. Dr. Ori prescribed Percocet and ordered Claimant to do daily walking exercises and keep his appointment with pain specialist for steroid injection. (Tr. 359).

On April 10, 2007, Dr. Wolkowitz administered a lumbar steroid injection. (Tr. 389-90).

On referral by Dr. Zsolt Ori, Dr. Craig Kuhns treated Claimant on April 16, 2007,for his lower lumbar disc. (Tr. 338-39). Claimant reported while getting out of his truck one month earlier experiencing left-sided leg pain and weakness. (Tr. 339). Claimant reported the epidural steroid injections he had received as treatment helped his leg symptoms, but he continues to have back pain. (Tr. 339). Claimant can dress without assistance, but his pain increases. (Tr. 340). Claimant reported lifting heavy objects to be painful. Pain prevents him from sitting, walking, or standing more than thirty minutes. (Tr. 340). Dr. Kuhns decided to treat Claimant with injections inasmuch as Claimant reported the symptoms somewhat tolerated by the injections. (Tr. 344).

In a follow-up visit with Dr. Ori on May 1, 2007, Claimant reported continued pain in his lower back and requested pain medication. (Tr. 355). Claimant also requested a statement "that he is unable to work because of his scarring and chronic pain at multiple locations." (Tr. 355). Dr. Ori diagnosed Claimant with chronic pain syndrome and chronic back pain. (Tr. 356). Dr.

Ori noted that he "wrote for him a statement, in my opinion, the patient is unable to do any type of job because of his chronic pain. He is on narcotics all of the time. His scarring prevents him also free movement or at least limits movements. He has neuropathy, impaired feeling with his skin." (Tr. 356). Dr. Ori refilled his Percocet prescription. (Tr. 356).

On June 19, 2007, on referral by Disability Determinations and after the administrative hearing before the ALJ, Dr. Craig Heligman, an occupational medicine specialist, completed a consultative examination. (Tr. 424-38). Claimant reported seeking disability benefits for chronic pain in back and feet. (Tr. 424). Claimant reported being able to walk two blocks, to stand for two hours, sit for thirty minutes out of each hour, to lift/carry twenty to thirty pounds without causing pain, and to drive a personal vehicle without restrictions. (Tr. 425). With respect to activities of daily living, Claimant reported no limitation in the ability to provide self-care and personal hygiene, and to prepare food, and to clean and care for the residence. Claimant reported having substance abuse treatment one year earlier and still consuming two to three drinks each week. Claimant last worked at Cardinal Health as a machine operator from October 1999 through December 2004 and being terminated due to excessive absenteeism. (Tr. 425). Dr. Heligman observed Claimant to be alert, oriented, and in no acute distress and showed no evidence of discomfort while seated or on the examination table. (Tr. 426). Dr. Heligman observed Claimant able to sit without fidgeting or changing position and able to mount examination table without assistance. Examination showed full range of motion forward flexion, extension, and left and right lateral flexion. Dr. Heligman observed Claimant able to toe walk, heel walk and tandem gait without support or assistive device. (Tr. 426). Claimant reported primarily pain as the limiting factor on his ability to work. (Tr. 428). Based on objective testing,

Dr. Heligman found that Claimant's reported pain correlated to scores on the hysteria and hypochondriasis scales. A psychometric screening test suggested that Claimant's perception was inconsistent with the clinical findings. Dr. Heligman noted that Claimant's self-reported pain was inconsistent with the observed behaviors and clinical examination findings. (Tr. 428). Dr. Heligman determined that Claimant to be capable of functioning at the light level of labor with no restriction in lifting, carrying, handling objects, hearing, speaking, seeing, and traveling. Dr. Heligman determined that Claimant would have to alternate every position from sitting, standing, walking every one to two hours. (Tr. 428). Dr. Heligman found no limitations in Claimant's understanding, memory, concentration, and persistence, social interaction, or ability to adapt. (Tr. 429). Dr. Heligman found that Claimant could frequently balance, occasionally climb, and never stoop, kneel, crouch, or crawl. (Tr. 436).

In a letter addressed the Social Security Administration dated February 29, 2008, written by Dr. Michael Acuff, the letter states:

> Mr. Welch was involved in a motor vehicle accident on January 7, 2005, in which he sustained a spinal cord injury that caused incomplete paraplegia, neurogenic bowel and bladder, as well as sensation changes throughout his perineal area and lower extremities. His recovery was complicated by residual disabilities incurred following an electrocution injury in 1984, that caused left-sided neurologic deficits, ocular changes that required left lens replaced and right lens removal with no implant placed, numerous plastic surgery repairs for burns over 60% of his total body surface area, decreased hearing, and short-term memory loss.
>
> On 12/14/07, Mr. Welch was seen in my clinic for a follow-up visit. He continues to exhibit the following deficits, resulting from his spinal cord injury, but compounded by his previous electrocution injury: severe spasticity of lower extremities, poor coordination and proprioception in the lower extremities due to lack of sensation, gait disturbance, lack of sensation in the perianal area, loss of bowel and bladder control due to neurogenic bowel and bladder, back and neck pain, stiffness and decreased range of motion in joints due to spasticity and arthritic changes, short-term memory loss.

For the above reasons, a permanent, partial disability is apparent for Mr. Welch that significantly impacts his ability to function in daily tasks and prevents him from being able to work. Please find attached clinical documentation from Rusk Rehabilitation Center and University Hospital and Clinics in support of this.

(Tr. 439).[2]

## IV.    The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since January 6, 2005, the alleged onset of disability. (Tr. 27). Claimant last met the special earnings requirement of the Act on January 5, 2005, through the date of the decision. The ALJ found that the medical evidence establishes that Claimant has status-post decompression laminectomy and fusion at T11-L2, degenerative disc disease at L4-L5 and L5-S1 with ongoing lumbago and chronic pain syndrome, status-post exploratory laparotomy and small bowel resection, cauda equina syndrome and small fiber polyneuropathy, dysthymia, and a history of polysubstance dependence, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ determined that Claimant's allegation of impairments, either singly or combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity to be not credible. The ALJ concluded that Claimant's residual functional capacity is for the full range of light-sedentary work reduced by the limitations of lifting and carrying more than ten pounds

---

[2]A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007). A review of the medical documents attached in support of Dr. Acuff shows these documents are medical records contained in the record, medical records of Claimant's surgeries after the motor vehicle accident and the discharge summaries from University of Missouri Health Care and Rusk Rehabilitation Center. (Tr. 440-62).

frequently or more than twenty pounds occasionally; doing more than simple, repetitive tasks or having close frequent interaction with coworkers, supervisors, or the general public. The ALJ determined that Claimant is unable to perform any past relevant work. (Tr. 27).

Considering Claimant's residual functional capacity, his age, education, work experience, and exertional functional capacity for light work, the ALJ determined that Claimant is not disabled and can perform substantial gainful activity existing in significant numbers in the local and national economies. (Tr. 28). The examples of such job included a total of about 8,000 light unskilled janitor and hand packager jobs and 2,000 sedentary assembler jobs in the State of Missouri, according to the vocational expert opinion. The ALJ found that Claimant was not under a disability at any time through the date of the decision. (Tr. 28).

## V.      Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." Id. The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to
exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the
claimant's impairments.

6. The testimony of vocational experts when required which
is based upon a proper hypothetical question which sets forth the claimant's
impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  Id.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

        As construed by the undersigned, Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly consider his spinal cord injury and a letter from Dr. Acuff stating Claimant cannot work.[3]  Claimant also

---

        [3]        A review of the record shows that after the ALJ's decision dated August 22, 2007, Claimant's counsel submitted a letter from Dr. Acuff stating that Claimant returned for treatment on December 14, 2007, and Dr. Acuff opined that Claimant had "a permanent, partial disability" that would "significantly impacts his ability to function in daily tasks and prevents him from being able to work." (Tr. 439).  Interestingly enough, the treatment note of December 14, 2007 is not included in the documents attached in support of the letter, and the undersigned finds the record submitted does not include a treatment note from Dr. Acuff dated December 14, 2007.
        A conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).  The undersigned notes that Dr. Acuff's letter is dated February 29, 2008, almost three years after the last date of treatment on March 18, 2005. (Tr. 249, 439).  The instant record is devoid of a December 14,

- 27 -

contends that the ALJ denied him a fair hearing by intimidating and manipulating him during the hearing.

A.     Spinal Cord Injury

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly consider his spinal cord injury.

In his decision, the ALJ noted that Claimant alleged disability "on the basis of injuries sustained in a motor vehicle accident on January 6, 2005, mainly his back." (Tr. 20).  The ALJ discussed how Claimant was hospitalized nineteen days after an alcohol-related motor vehicle accident on January 6, 2005.  (Tr. 21).  On January 14, 2005, Claimant had a decompressive laminectomy and posterior spinal fusion to correct a burst fracture from T11 to L2.  The ALJ noted that after the discharge from the hospital, Claimant was admitted to Rusk Rehabilitation Center for spinal rehabilitation and discharged on February 28, 2005.  The ALJ noted that Claimant underwent a course of outpatient physical therapy at HealthSouth from March 7 to May 20, 2005. On March 18, 2005, Claimant returned to Dr. Acuff for a follow-up visit for his thoracic spine fracture, and Dr. Acuff noted that Claimant could walk normally with a Jewett brace in place.  Claimant reported pain at the five level in severity, and he reported pain is fairly

2007 treatment note by any doctor. The record shows that Dr. Acuff last treated Claimant on March 18, 2005, in a follow-up visit for his thoracic spine fracture.  (Tr. 249).  Indeed, Claimant reported his pain as being fairly well controlled during the office visit.  (Tr. 249).  Dr. Acuff found Claimant to be medically stable with his spine fracture and pain.  (Tr. 250).  Dr. Acuff's opinion set forth in the letter dated February 29, 2008, that claimant is unable to work should not be given any controlling weight inasmuch as there was no substantive evidence to support this opinion and the opinion is refuted by Dr. Acuff's own treatment notes and physical findings.  A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

well controlled.  (Tr. 21, 250).  The ALJ noted that Claimant received epidural pain injections on April 22, 2005, March 2, 2006, July 14, 2006, September 15, 2006, and November 29, 2006, and January 31, 2007, March 13, 2007, and April 10, 2007.  (Tr. 21-22).[4]  The ALJ found that by March 29, 2006, Claimant reported feeling better and the treatment being very successful in terms of pain management and doing daily walking and stretching exercises.  (Tr. 22, 364).  On April 16, 2007, and May 1, 2007, Claimant received medical treatment for his back pain, and the ALJ noted how Claimant reported his pain level to be a three.  (Tr. 22).

In the post-hearing consultative examination requested by the ALJ, Dr. Craig Heligman noted that Claimant's diagnosis continued to be lumbago and chronic pain syndrome.  (Tr. 23).  Dr. Heligman examination showed inconsistencies between the objective findings and Claimant's subjective complaints.  Based on objective testing, Dr. Heligman found that Claimant's reported pain correlated to scores on the hysteria and hypochondriasis scales.  A psychometric screening test suggested that Claimant's perception was inconsistent with the clinical findings.  Dr. Heligman noted that Claimant's self-reported pain was inconsistent with the observed behaviors and clinical examination findings.

The undersigned finds that after undergoing back surgeries and rehabilitation services to treat his back injuries, his medical condition improved.  (Tr. 21-22).  "An impairment which can

---

[4]The undersigned notes that there was a gap in medical treatment from April 22, 2005, until February 6, 2006. Such a gap suggest that Claimant's subjective complaints of disabling pain are not entirely credible. See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995) (citing Benskin v. Bowen, 830 F.2d 878, 884) (8th Cir. 1987) (holding that the "claimant's failure to seek medical treatment for pain" is a legitimate factor for an ALJ to consider in rejecting a claimant's subjective complaints of pain).  "[T]he failure to seek medical treatment for such a long time during a claimed period of disability tends to indicate tolerable pain."  Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

be controlled by treatment or medication is not considered disabling." Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009) (quoting Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)). The medical record shows that Claimant's back impairment from January 2005 through May 2005 imposed significant work-related limitations. The ALJ found that the limitations did last for a continuous period of twelve months. 42 U.S.C. § 1382c(a)(3)(A). The record shows that from April 22, 2005, until February 6, 2006, Claimant neither sought nor received additional medical treatment for his back pain during the time of his alleged disability. See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (A lack of regular and sustained treatment is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (the absence of ongoing failure to seek treatment may be considered as inconsistent with a finding of disability); see also Banks v. Massanari, 258 F.3d 820, 825-26 (8th Cir. 2001) (ALJ properly discounted claimant's complaints of disabling depression because, among other reasons, she did not seek additional psychiatric treatment).

The ALJ determined that based on the medical record, Claimant had recovered from his accident-related back injuries. (Tr. 24). Indeed, the ALJ noted that Claimant has not had any additional surgeries or inpatient hospitalizations or physical therapy referrals and has not used a brace, wheelchair or walker since May, 2005. (Tr. 25). The ALJ found that [t]he medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment." (Tr. 25). Accordingly, the ALJ properly discredited Claimant's allegations of disabling back impairment after undertaking the proper analysis.

B.     The Administrative Hearing

Claimant contends that the ALJ denied him a fair hearing by intimidating and manipulating him during the administrative hearing.

In an administrative hearing, as in a judicial proceeding, a party has a due process right to be heard by an impartial decision maker. Keith v. Massanari, 17 F. App's 478, 481 (7th Cir. 2001). ALJs are presumed to be unbaised, although this presumption can be rebutted by showing a conflict of interest or some other specific reason for diqualification. Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001). Expressions of annoyance, impatience, dissatisfaction, and even anger, that are within the bounds of what imperfect men and women sometimes display, do not establish bias. Id. at 858. To show bias, the claimant must demonstrate that the ALJ's behavior, in the context of the whole case, "was so extreme as to display [a] clear inability to render fair judgment." Id.

A social security hearing is a non-adversarial proceeding, which requires the ALJ to fully and fairly develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ bears a responsibility to develop the record fairly and fully, independent of plaintiff's burden to prove her case and notwithstanding the fact that plaintiff is represented by counsel. See Snead v. Barnhart, 360 F. 3d 834, 838 (8th Cir. 2004) (citing a number of sources describing the non-adversarial nature of social security hearings and the ALJ's duty to develop the record). Claimant's administrative hearing lasted forty-seven minutes, and Claimant was represented by counsel. (Tr. 463-65, 490). Though the length of a hearing is not dispositive, it is a consideration. Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994). Claimant and a vocational expert testified, responding to questions posed by his attorney and the ALJ. At the conclusion of

the hearing, the ALJ arranged for additional medical assessment to be made. (Tr. 489).[5] See 20

C.F.R. § 404.1545(a)(3) (the Social Security Administration's responsibility to develop a

complete medical record before making a "not disabled" determination includes re-contacting

medical sources and arranging for consultative examinations).  Further, the ALJ inquired into

Claimant's daily activities and capabilities during the relevant period.  See Groper v. Sullivan, 932

F.2d 1234, 1238-39 (8th Cir. 1991) (ALJ must specifically set forth claimant's physical and

mental limitations and determine how those limitations effect the claimant's RFC).  None of his

comments or questions during the hearing show bias or disrespect to Claimant or his claims; nor

does anything in the ALJ's written opinion display such bias.  Claimant has not provided any

evidence that the ALJ made any derogatory statements about Social Security claimants.  See

Doan v. Astrue, Cause No. 4cv2039 DMS (RBB), 2010 WL 1031591, at * 14 (S.D. Cal. March

19, 2010) (referring to ALJ's statements about "no-goodnicks" and a need "to protect the public

treasury.").  And significantly, Claimant does not cite to any specific comments or line of

questioning he believes to be inappropriate.  The ALJ retains the responsibility of developing a full

and fair record in the non-adversarial administrative proceeding.  Hildebrand v. Barnhart, 302

F.3d 836, 838 (8th Cir. 2002).  Accordingly, record demonstrates that Claimant received a full

and fair hearing before the ALJ.  See e.g., Smith v. Astrue, Cause No. H-07-2229, 2008 WL

4200694, at *5 (S.D. Tex. Sept. 9, 2008) ("This court will not set aside the ALJ's decision based

on allegations of generalized bias where the record reflects no particular bias against the claimant

---

[5]In a letter dated May 25, 2007, the ALJ apprised Claimant's counsel of the request he made to
Disability Determination Services to schedule a consultative examination of Claimant.  (Tr.
114-17).  In a letter dated June 25, 2007, the ALJ apprised Claimant's counsel that he had secured
additional evidence, the consultative report of Dr. Craig Heligman, and that he proposed to enter
the evaluation completed by Dr. Heligman in the record after counsel's review.

and adequately supports the decision.").

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome, or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen  (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE


Dated this   3rd    day of March, 2011.